## CITIZENS BANKING & SAVINGS CO v SPITZER, RORICK & CO et

Ohio Appeals, 2nd Dist, Franklin Co

No 2847. Decided July 15, 1938

Ernest Cornell, Cleveland. TouVelle & Glander, Columbus, for plaintiff-appellee. Fraser, Effler, Shumaker & Wynn, Toledo, Dennis W. Drenner, Toledo, for defendants-appellants.

### OPINION

By BARNES, PJ.

The above entitled cause is now being determined as an error proceeding by

reason of defendants' appeal on questions of law from the judgment of the Court of Common Pleas of Franklin County, Ohio.

The plaintiff's cause of action is predicated upon a charge that the defendant Spitzer, Rorick & Company, a dealer in securities under a license issued by the State of Ohio, fraudulently disposed of certain securities to plaintiff and by certain misrepresentations, which were false and untrue, and which were known or should have been known to defendant as false and untrue induced the plaintiff to purchase bonds of the Everglades Drainage District State of Florida, maturing January 1, 1932, in the amount of $10,000.00.

It is averred that the defendant, the Standard Accident Insurance Co., as surety, signed the dealer's bond which the dealer filed with the commissioner of securities of the State of Ohio. Plaintiff avers that on and prior to May 18, 1925, the defendant dealer furnished certain information concerning Everglades Drainage District bonds, consisting of data, information, prospectuses, circulars, etc., and that part of the information thus furnished was in the following language:

"The State of Florida now owns approximately one-quarter of the lands within this district upon which drainage taxes are expressly levied under the statute authorizing these bonds. The law also provides that in case the drainage taxes on any other lands in the district are not paid the title thereto automatically becomes vested in the State of Florida in the absence of other bidders at delinquent tax sale and the state is thereafter obligated to pay the drainage taxes on these lands, the same as on all other lands owned by the state within said district. Owners of lands are given two years after tax sale within which to redeem their lands, after the expiration of which period the state has promptly paid all delinquent drainage taxes and can be depended upon to do so in the future as provided by law. In practical effect, therefore, the state guarantees the payment of all Everglades Drainage taxes and bonds payable therefrom. The state incurs no loss by doing this as in all cases the lands are worth much more than the amount of drainage taxes levied thereon, which annual levy is unusually small and unburdensome, ranging from 5 cents to 92 cents per acre."

The matter quoted above is the statement which contains the claim of fraudulent mis-

conduct upon which it is averred plaintiff relied.

It is further alleged that the bonds purchased by plaintiff were securities of a taxing subdivision payable out of the proceeds of special taxes, and not out of the proceeds of a general tax and that before marketing said bonds the dealer should have filed certain information, together with the prospectus, with the Securities Commission and that the sale of said securities to plaintiff was contrary to the provisions of §§6373-1 to 6373-24 GC.

The prayer of the petition was for damages in the sum of $9200.00 with interest from May 18, 1925 to December 4, 1933. The Petition was filed in October, 1934.

Defendants demurred to the petition on two grounds:

1. That the cause of action was barred by the statute of limitations.

2. That the petition failed to state a cause of action.

The demurrer was overruled and exceptions noted.

Defendants then answered, setting up the Statute of Limitations, which averments, upon motion, were stricken. Defendant dealer then filed an amended answer which insofar as is material to the questions here presented, admitted the statements quoted in plaintiff's petition; denied that they were false and untrue; alleged that they were made in good faith after a thorough investigation and upon information which was deemed to be trustworthy and true.

It was further averred that between the time of the acquisition of the securities by plaintiff and the time they defaulted, there had been a collapse of property values in the State of Florida and an unprecedented depression throughout the United States. It is further alleged that on the date of the purchase of the bonds and for several years thereafter said bonds were worth par, plus accrued interest, on the market.

Defendants answered, specifically denying that under the laws of Ohio it was required to file any information or prospectus with the Commission of Securities before the bonds could be lawfully marketed. Defendant further alleged that by the consent filed with the Commissioner of Securities it could be sued in Franklin County in any action founded upon a fraudulent disposal by it of securities and that the trial court obtained only special jurisdiction over it, and if plaintiff failed to show that it was guilty of fraud in the sale of the bonds, the court was without juris-

diction to render judgment against the defendant.

The defendant surety company, after admitting certain formal averments of the petition, generally denied all other material averments.

The reply was a denial of the affirmative averments of the answer of defendant dealer, and set forth part of the constitution of the State of Florida which prohibited the issuance of bonds by the state, except for the purpose of retelling invasion or suppressing insurrection, and prohibiting the pledging of the credit of the state to any individual company, corporation or association.

The trial court, after making separate findings of law and fact, found for the plaintiff and against the defendant in a written decision with which we have been favored. The court held against the plaintiff on the claim that the defendant dealer was required before marketing the bonds in question to file certain information together with the prospectus with the Securities Commission, and, further that if the defendant was required to file such information with such commission, such failure would not work a fraud in itself upon the plaintiff, because it did not appear that the plaintiff had any knowledge whatsoever respecting the failure of defendant dealer to file the information with the Securities Commission and cause the securities to be certified.

The court found that under all the evidence, the statements made by the defendant dealer, upon which plaintiff relied, were fraudulent misrepresentations of fact, designed for the purpose of misleading purchasers of bonds to believe that the Everglades Drainage District bonds were guaranteed by the State of Florida. The court further held that it had jurisdiction of the subject matter under §6373-3 GC, effective as of the date of the sale of the securities, and that the statute of limitations urged by defendant dealer as a bar to the action, would not have application.

The court further determined that the measure of plaintiff's damages was the difference between the price paid for the bonds and their market value at the time of their maturity, and that the value of the bonds at the time of maturity was $140.00 for each $1000.00 bond. The evidence disclosed that the interest had been paid on the bonds to January 1, 1931. The court deducted from the purchase price of $10,000.00 the sum of $1400.00, the market value of the securities on the date of maturity, fixing the loss upon the bonds at

$8600.00, to which interest was allowed at 5% for the year 1931, in the sum of $500.00 aggregating $9100.00 for the sum the court found for the plaintiff, with interest at 6% from January 1, 1932. The court entered judgment upon the findings.

The errors assigned are:

"1. The trial court erred in overruling the demurrer interposed by defendants to plaintiff's petition, on the ground that the cause of action therein attempted to be asserted was barred by the statute of limitations.

"2. The trial court erred in striking from the separate answers of the defendants affirmative defenses therein set forth based upon the bar of the statutes of limitation.

"3. The finding and judgment of the court below are not supported by any evidence and are manifestly against the weight of the evidence.

"4. The lower court erred in its application of the law with respect to the measure of damages, and the judgment rendered is excessive in amount.

"5. The court below erred in the admission of evidence to which defendants objected.

"6. The lower court erred in overruling defendants' motion for new trial and not entering judgment in favor of defendants."

We consider the errors in the order in which they are assigned in the brief of defendants.

Nos. 1 and 2 present the same question, viz., whether or not the trial court erred in determining that the cause of action of plaintiff was not barred by any statute of limitation.

It is the claim of the plaintiff, supported by the trial court, that the time within which the instant action could have been instituted was controlled by §11226, GC.

"Sec 11226 GC. On official bond. An action on the official bond, or undertaking of an officer, assignee, trustee, executor, administrator, or guardian, or on a bond or undertaking given in pursuance of statute, shall be brought within ten years after the cause thereof accrued."

Plaintiff further claims that the cause of action is predicated upon §6773-3, GC, and upon the terms of that section alone.

The defendants claim that plaintiff's action is either predicated upon special statutory liability or upon common law fraud.

If upon the former, the six year limitation, as provided in §11222, GC, controls. It is urged that inasmuch as plaintiff asserts that its action is founded upon §6373-3, GC, which is a right that did not exist prior to or independent of said section, it clearly is a special statutory liability and therefore controlled by §11222, GC.

Supporting this proposition the following cases are cited:

Seymour v Railroad Co., 44 Oh St 12.

Hocking Valley Ry. Co. v N. Y. Coal Co., 217 Fed. 727.

Fidelity & Deposit Co. v Lindholm, 66 Fed. (2d) 56.

There is no doubt that the liability upon which plaintiff relies is created by statute. The section provides not only the right to begin an action against a dealer who has sold securities through misrepresentation, but the section also provides that the bondsmen may be joined. It is further provided in the section requiring the bond, that the liability is several and general. This is a theory under which it is contended that the action is upon the bond and therefore controlled by the statute of limitation of ten years, as provided by §11226, GC.

Cases cited supporting the claim that the ten year statute of limitation controls are the following:

King et v Nichols et, 16 Oh St 80.

State, etc. v Orr et, 16 Oh St 523;

Casualty Co. v McDiarmid, 116 Oh St 576;

McCoy v Stone Co., 27 N.P. (N.S.) 544.

Ohio Jurisprudence, Vol. 36, page 483, §9;

Contra, it is urged that the bond is but a collateral security for the faithful performance of the duties enjoined upon the dealer under the Blue Sky Law; that the principal obligation of the dealer being barred within six years after the cause of action accrued, the collateral obligation of the surety could exist no longer than the principal liability. Supporting this claim the defendants cite the following authorities:

Wharton v U. S., 9 Wheat., 651.

State v Blake, 2 Oh St 147.

Riddlesbarger v Hartford Ins. Co., 7 Wall., 386.

Orosen v McNeill, 103 Kan. 429.

Oregon v Davis, 71 Pac. 68

Ryus v Ruble, 3 Pac. 518 (Kan.)

Gallatin County v U. S. F. & G. Co., 144 Pac. 1085.

Biddle v Wendel, 37 Mich., 452.

Hurst v Charron, 267 Mich., 210.

Sonoma v Hall, 132 Cal. 581.

The case of State v Blake, 2 Oh St 147, (a decision by Judge Ranney) presents a very able and comprehensive analysis supporting the theory that the bond given by a public officer is only a collateral security for the faithful performance of his official duties, and can exist no longer than the liability it was created to secure.

In the case of King et v Nichols et, 16 Oh St 80, it was held that an action against a former sheriff and his bondsmen for failure to pay over money on an attachment process, is not barred by the statute of limitation until ten years after such breach. In other words, it is considered as an action on the bond and controlled by the limitation of ten years under the general provisions and not removed therefrom by the claim that the bondsmen's liability is collateral to that of his principal. In this case of King v Nichols, supra, no reference is made to the earlier case of Ohio v Blake. In the opinion reference is made, on page 86, to earlier decisions which were stated not to be controlling because of changes in the Code.

In the case of Maryland Casualty Company v McDiarmid, 116 Oh St 576, at pages 585 and 586 of the opinion, attention is again called to the fact that the divergence of opinion as announced in 16 Oh St 522, supra, and the earlier decisions including 2 Oh St 147, supra, were due to change in statutory law.

But for the rule of stare decisis we would accept the argument that the action is one created under statute and would be barred in six years. The argument is very persuasive that the bond was only collateral to the principal liability and therefore should not extend the right of action beyond the time where it could be brought against the principal alone. This is the announcement so ably made in the case of Ohio v Blake, 2 Oh St 147. However, the later decisions of the Ohio Supreme Court hold otherwise. As we view it, the case of King et v Nichols et, 16 Oh St 80, is directly in point. If the principle therein announced is to be changed, it must be done by the Supreme Court and not by this court.

We find no error under specifications Nos. 1 and 2 of the assignments of error.

THIRD ASSIGNMENT:

"The finding and judgment of the court below were not supported by any evidence and are manifestly against the weight of the evidence."

One of the first questions to be determined is whether or not the action is founded upon actual fraud practiced upon the

plaintiff by the defendant dealer, or upon innocent misrepresentations of material facts. This is very important and makes a vast difference in the measure of proof.

To constitute actual fraud the following elements must be made to appear:

1. That the representation made was false.

2. That the representation claimed to be false related to a material existing fact and did not constitute a mere matter of opinion or future promise.

3. That the party making the representation could by some manner or means have ascertained that it was untrue.

4. That the representation was made with the intention that it be relied upon.

5. That the representation was in fact relied upon.

6. That the party relying upon such claimed misrepresentation was damaged as a direct result thereof.

Innocent misrepresentation of material facts requires very few of the elements of actual fraud. Much of the briefs of the respective parties is devoted to this question. This question arises through apparent conflict in different provisions of the Blue Sky Law. For instance, in §6373-3, GC, defining the conditions of the bond, there appears the following:

"Shall be conditioned upon the faithful performance of all the provisions of this Act and shall also indemnify any purchaser of securities from such dealer or agent who suffers a loss by reason of **misrepresentations** in the sale of such securities by such dealer or agent."

(Emphasis ours).

Under this same paragraph of Subdivision D provision is made that any purchaser claiming to have been damaged by misrepresentation in the sale of any security by such dealer or agent may maintain an action at law against the dealer or agent making such misrepresentation; and may join as parties defendant the securities on the bond herein provided.

The last paragraph of the same section contains the provision requiring all applicants for license to file with the Commissioner of Securities a duly executed written instrument, consenting that any action brought against such applicant arising out of and founded upon a fraudulent disposal of such securities by him or his agent, may be brought in Franklin County.

Then follows the provision for serivce on a nonresident of Franklin County.

The defendant dealer in the instant case was a partnership located in Toledo, Lucas County, Ohio. The bondsman The Standard Accident Insurance Company, is a corporation organized and existing under and by virtue of the laws of the State of Michigan duly domiciled and licensed to carry on business within the state of Ohio. Service was made on the defendant dealer in the form prescribed under the above-quoted provisions of §6373-3, GC.

Plaintiff's petition alleges all the elements of actual fraud, and. thereby brought itself within the exact provisions of the last paragraph of §6373-3, GC, authorizing service by mail.

In the trial of the case and in our court, plaintiff argues that it need only prove misrepresentation as required under the first paragraph of Subdivision D of the above section relating to the condition of the bond.

Counsel for the parties are at variance as to what should be the meaning of the word 'misrepresentation', as used in this first paragraph of Subdivision D. one side contending that innocent misrepresentations if afterwards found to be untrue, would be a sufficient predicate in an action for any loss sustained; whereas it is the claim of counsel for the defendants that the term should be construed as synonymous with the definition of actual fraud. Counsel for defendants, in support of their contention, also cite §6373-18, GC, which, if in pari materia with §6373-3 GC, would require proof of all elements constituting actual fraud. It was the view of the trial court that §6373-18 GC, was not in pari materia with §6373-3, GC, and with this conclusion we are in accord. While the trial court did not specifically so state, we take it from the text of his opinion that the elements of actual fraud were required to be proven, and this probably on the theory that the bringing of the action in Franklin County was by virtue of the specially conferred jurisdiction, and therefore would be limited to the form of action provided in the conferring of such sepcial jurisdiction.

It is our conclusion that the elements of actual fraud must be proven in order for plaintiff to recover. The trial court found that actual fraud was proven and ruled judgment for the. plaintiff.

We now search the record as to whether or not the judgment is supported by any evidence or is manifestly against the weight

of the evidence. This requires a very, careful and full reading of the evidence. This we have done and reread it many times.

There is much conflict in the testimony. The controverted question in the main revolves around the language contained in the prospectus given out by the defendant dealer to the plaintiff bank before the sale and purchase of the bonds. The plaintiff bank owned securities of the par value of approximately $59,000.00, and on or about May 18, 1925, exchanged said securities for $50,000.00 par value bonds of several issues, including the $10,000.00 par value State of Florida Everglades Drainage District, due January 1, 1932. In the trade a difference in cash was paid to plaintiff. The deal was negotiated May 18, 1925, but the exchange was not actually consummated until July 7, 1925.

Upon order of plaintiff, the entire issue of $50,000.00 was delivered direct to the Treasurer of State as a requisite deposit to enable the bank to engage in a trust business. The present controversy, of course, only involves the $10,000.00 for the Everglades Drainage District 5% bonds. This entire issue of bonds was due January 1, 1932. Interest was paid regularly on the bonds until January 1, 1931, when there was a default in the payment of interest and principal on previous issues. For a number of years and up to within a few years of the default, the bonds were selling in the market at approximately par. The Everglades Drainage District approximated 5,000,000 acres in southern Florida. Practically all of the lands embraced within the district were originally ceded by the United States Government to the State of Florida by an Act of Congress, passed in 1850, which Act imposed upon the state the the obligation of reclaiming these lands. Shortly after this grant, the Florida Legislature passed an act creating a state board known as the Internal Improvement Board, to hold title to these lands in trust for the state. The Governor, State Treasurer, State Comptroller, Attorney General, and Commissioner of Agriculture, ex officio, constituted the board. The same officers likewise constituted the Board of Commissioners of Everglades Drainage District, in which board is vested the management and control of the district. The total amount of bonds issued as of January 1, 1925, was $10,950,000.00. All of the above data was set forth in the circular or prospectus presented to the plaintiff bank before their purchase of the $10,000.00 bonds. The prospectus introduced in evidence as plaintiff's Exhibit H, is a four-page circular,

printed matter being on three pages, and the back page a colored map showing the boundaries of the district.

Plaintiff in its petition complains of defendant dealer that on and prior to the 18th day of May, 1925, it furnished or caused to be furnished to plaintiff the following information relative to the State of Florida Everglades Drainage District 5% gold bonds, in the following language, to-wit:

"The State of Florida now owns approximately one-quarter of the lands within this district upon which drainage taxes are expressly levied under the statute authorizing these bonds. The law also provides that in case the drainage taxes on any other lands in the district are not paid the title thereto automatically becomes vested in the State of Florida in the absence of other bidders at delinquent tax sale and the state is thereafter obligated to pay the drainage taxes on these lands, the same as on all other lands owned by the state within said district. Owners of lands are given two years after tax sale within which to redeem their lands, after the expiration of which period the state has promptly paid all delinquent drainage taxes and can be depended upon to do so in the future as provided by law. In practical effect therefor, the state guarantees the payment of all Everglades Drainage taxes and the bonds payable therefrom. The state incurs no loss by doing this as in all cases the lands are worth much more than the amount of drainage taxes levied thereon, which annual levy is unusually small and unburdensome, ranging from 5 cents to 92 cents per acre."

Plaintiff further alleges that it relied upon the data and information furnished by the defendant Spitzer, Rorick & Company, and believed same to be true and that under such belief it purchased from the defendant dealer the $10,000.00 5% bonds. Plaintiff further alleges that each and every one of the foregoing statements and representations were false and untrue, and made for the purpose of deceiving and misleading said plaintiff, and that the defendant Spitzer, Rorick & Company, knew or should have known that such statements and representations were false and untrue in the respects hereinafter set forth.

"That the State of Florida had not, at the time of said sale of said bonds to this plaintiff by the licensed defendant or at any time thereafter guaranteed the payment of all Everglades drainage taxes and

the bonds payable therefrom; that the State of Florida, at the time of said sale as aforesaid, was not legally bound to pay said drainage taxes as represented by the licensed defendant; that said drainage taxes in said district as aforesaid, were not a direct obligation of the State of Florida, nor were the moneys appropriated by the Legislature of the State of Florida sufficient to pay all of said drainage taxes at the time plaintiff purchased said bonds; that the State of Florida had refused and/or failed to appropriate moneys to pay said drainage taxes and permitted said taxes to become delinquent; whereby plaintiff received no interest upon said bonds.

"That the State of Florida had not, when plaintiff purchased said bonds, guaranteed the payment of the principal of said bonds at their maturity on January 1st, 1932; nor did the State of Florida at any time in the future guarantee the payment of said bonds as represented by the licensed defendant; that there was no written guarantee by the State of Florida of any kind or description incorporated and made a part of said bonds, or otherwise, whereby the State of Florida guaranteed the payment of said bonds upon the date of their maturity."

Defendant partnership in its answer admits that the circular or prospectus presented to plaintiff contained the language exactly as set out in the petition. The answer then denied that said statements were untrue and false, and by way of further averment they allege that said statements and representations were and are now believed by this defendant to be true.

"Said statements and representations were made by this defendant in good faith, after a thorough investigation by this defendant and upon information furnished this defendant by officials of the State of Florida and others, upon which defendant relied and which defendant believed to be trustworthy and to be true, including the written approving opinions of said issue of bonds by Honorable Rivers Buford, then Attorney General of the State of Florida, and Honorable J. B. Johnson, special counsel for the trustees of the Internal Improvement Fund of the State of Florida and for the Board of Commissioners of Everglades Drainage District and other opinions which this defendant then considered and now considers reliable."

Let us examine sentence by sentence, the representations made by Spitzer, Rorick &

Company on which plaintiff claims it relied and which they now say are false:

"1. The State of Florida now owns approximately one-quarter of the lands within this district upon which drainage taxes are expressly levied under the statute authorizing these bonds."

The evidence discloses that the state did own approximately one-quarter of the land within the district.

Defendants' Exhibit 6 is a certified copy of Chapter 9119, Laws of Florida, enacted in 1923, and in effect May 18, 1925. The last paragraph of §1, on page 17, reads as follows:

"The lands within said district held by the trustees of the Internal Improvement Fund shall be subject to the taxes hereby imposed and the said trustees in furtherance of the trust upon which the said lands are held are hereby authorized and empowered to pay the same out of any funds in their possession derived from the sale of land or otherwise."

The claim may be made that it was incorrect to state that the State of Florida now owns, etc., and that the more correct statement would be to say that the Internal Improvement Board holds title to the land in trust for the state. This exact information is given on the third page of the prospectus and follows a recital of the ceding of the lands by the United States Government to the State of Florida by an Act of Congress passed in 1850. Then follows:

"Shortly after this grant the Florida Legislature passed an act creating a State Board known as the Internal Improvement Board to hold title to these lands in trust for the state. The Governor, State Treasurer, State Comptroller, Attorney General, and Commissioner of Agriculture ex officio constitute this board. These same officials likewise constitute the Board of Commissioners of Everglades Drainage District, in which board is vested the management and control of said district."

In the light of the other provisions of the prospectus we find nothing materially untrue or false in this first sentence.

SECOND SENTENCE:
"The law also provides that in case the drainage taxes, on any other lands in the district are not paid the title thereto au-

tomatically becomes vested in the State of Florida in the absence of other bidders at delinquent tax sale and the state is thereafter obligated to pay the drainage taxes on these lands, the same as on all other lands owned by the state within said district."

Many of the observations relative to the first sentence are applicable to this second. The evidence disclosed that it is the law that in case the owner fails to pay taxes on lands which he may own in the district, the owner's title is forfeited and in the absence of other bidders at the tax sale, the title is vested in the trustees for the state and thereafter the taxes are paid the same as on any other lands owned by the state within the district.

### THIRD SENTENCE:

"Owners of land are given two years after tax sale within which to redeem their lands, after the expiration of which period the state has promptly paid all delinquent drainage taxes and can be depended upon to do so in the future as provided by law."

The following words "can be depended upon to do so in the future as provided by law," are an opinion as to a future event and can not support the claim of fraudulent misrepresentation. The evidence discloses that owners are given two years within which to redeem. Also it appears from the evidence that at the time of the prospectus the state had paid all delinquent drainage taxes.

### FOURTH SENTENCE:

"In practical effect therefore, the state guarantees the payment of all Everglades Drainage taxes and the bonds payable therefrom."

The words "in practical effect therefor", necessarily qualify the remaining part of this sentence. This sentence can bear no other construction than that it was the writer's opinion that the practical effect of what was previously stated would be a guarantee to the state of all drainage taxes and the bonds payable therefrom. The reasoning is apparent, although subsequent events may have disclosed it not to be well grounded. In the first instance the state owned all the lands contained within the district. It acquired it from the United States Government under a grant requiring it to improve it. It set up by Act of the Legislature, a controlling board known as the Internal Improvement Board, to hold

title in trust for the state. The necessary improvements consisted of dikes, canals, ditches and so forth. Money for making the improvements would be obtained from the sale of lands and the issuing of bonds. Where bonds were issued the interest on the bonds and their retirement at maturity was provided through the levying of taxes on all the lands within the district, whether held by private owners or the state. The state, through its organized board, was authorized to pay the taxes from the sale of lands or any other money that might come into their hands. According to the testimony the average price per acre of the land sold was $108.00 an acre. The Legislature provided that if any owner of land defaulted in his payment of taxes, and if not bid in by some other individual, it would be forfeited to the state. The character of the legislation provided for the issuing of bonds and the levying of taxes provided a perpetual acreage tax, so long as bonds were outstanding. Under the situation as it existed in 1925 we are unable to say that it was even the exercise of bad judgment for the defendant to state in their prospectus "that in practical effect therefor, the state guarantees the payment of all Everglades drainage taxes", etc.

In addition we also find that the defendants were supported in this conclusion by the law firm of Tracy, Chapman & Wells, Toledo, Ohio. This firm was a very well known and reputable firm of lawyers. Their letter to Spitzer, Rorick & Company is dated March 26, 1925, and gives an opinion as to the Everglades Drainage District Improvement bonds. On the second page of the letter, we find the following:

"These bonds are also in our opinion a quasi or indirect obligation of the state of Florida in that the state owns approximately one-quarter of the lands within said drainage district against which drainage taxes are now and have been collected since 1905 as required by law and in the event that any other owner of lands within said drainage district neglects or refuses to pay his drainage taxes the law requires that they be certified to the trustees of the Internal Improvement fund, a board of state officers who hold all lands of the state in trust for the state and at the end of two years, if not redeemed the state's title becomes perfect."

There is evidence that the above letter, as well as others, was handed to the rep-

184

resentative of the bank before it purchased the bonds.

Also in a letter from the Attorney General of the State of Florida, under date of April 1, 1925, to Spitzer, Rorick & Company, relative to the Everglades Drainage District, on page two of said letter, appears the following:

"These bonds are also a quasi or indirect obligation of the State of Florida in that the state owns approximately one-quarter of the lands within said Everglades Drainage District, against which drainage taxes are now and have been since 1905 collected as required by law, and in the event that any other owner of lands within such drainage district neglects or refuses to pay his drainage taxes, the law requires that they be certified to the trustees of the Internal Improvement fund, a board of state officers, who hold all lands of the state in trust for the state, and at the end of two years, if not redeemed, the state's title becomes perfect."

Also in letter dated March 13, 1922, from Glenn Perrell, counsel for the trustees of the Internal Improvement fund, on page 2 is a statement substantially the same as in the two letters heretofore quoted from.

Also in letter under date of April 1, 1925, to Spitzer, Rorick & Company, from J. D. Johnson, special counsel for the trustees of the Internal Improvement fund, on page 2, there is contained substantially the same statement as in the two letters quoted from.

In letter of July 15, 1925, from W. H. Harris to Spitzer, Rorick & Company, there appears the following:

"The state, as authorized by law, pays taxes on the bonds so owned by it at the same rate as was paid by other owners of lands in said district; when taxes levied on lands of other owners in said district become delinquent and remain unpaid such lands revert to the State of Florida and said delinquent taxes are at once paid by the state, so that payment of the interest and principal of said bonds is by this method guaranteed by the State of Florida."

The author of this letter, Mr. Harris, was associated with the law firm of Denman, Wilson, Miller & Wall, of Toledo, Ohio. He is the author of "Harris on Municipal Bonds." This letter postdates the sale of the bonds to the plaintiff bank, but it is eminent authority supporting the statements made in the prospectus.

SENTENCE FIVE:

"The state incurs no loss by doing this as in all cases the lands are worth much more than the amount of drainage taxes levied thereon, which annual levy is unusually small and unburdensome ranging from 5 cents to 92 cents per acre."

The only statement of fact contained in this sentence is that the taxes ranged from 5c to 92c per acre. The evidence supports this statement as being true. The statement that the lands are worth much more than the drainage taxes is supported by the uncontradicted evidence that the average sale of all lands was $108.00 per acre. It is doubtful if this is anything more than an expression of opinion, as is also all the remaining portion of the sentence.

The above five sentences, as presented in the petition as one paragraph taken from the second page of the prospectus, are the only specific allegations of representations made by the defendant Spitzer, Rorick & Company, through their agent, a Mr. Reed. No other or further representations may be considered, except as other representations may aid in determining the intended meaning of the statement made. Both sides are entitled to have the prospectus as a whole considered as it bears upon the alleged claim that the specific statements were false and untrue, known to be such by the defendant Spitzer, Rorick & Company, intended to be relied upon by the plaintiff bank; and were in fact relied upon by the plaintiff bank.

Counsel for plaintiff in their brief base their major contention on the claim that the defendants Spitzer, Rorick & Company, falsely represented to the plaintiff bank that these Everglades bonds were guaranteed by the State of Florida, and that the representative of the bank believed that the bonds were payable, if necessary, from the general revenue of the State of Florida. We are unable to arrive at the conclusion that the specific language quoted as being a false representation made, will bear any such construction, nor do we find in any other part of the prospectus statements which would give to the quoted portion such a conclusion.

The representative of the bank who conducted the negotiation for the purchase of these bonds was called as a witness. He states in his evidence that he read over the prospectus. We fail to understand how he could arrive at the conclusion that the fund for the payment of interest on the bonds

and their retirement could arise from any other source than a tax on the lands within the district, or a sale of the lands themselves. The prospectus contains the statement that the bonds are a quasi or indirect obligation of the state in addition to being a direct and general obligation of the entire Everglades Drainage District. This is the exact language used in the letter, defendants' Exhibit 3, by Rivers Buford, Attorney General of the State of Florida. This is quite different from the claim that it was a direct or unqualified guaranteed obligation. The prospectus as a whole discloses the circumstances and in what manner the state pays taxes within the district.

The trial court in its opinion places great stress on the language contained in the caption of the prospectus, which, he reasons, supports plaintiff's claim that defendant Spitzer, Rorick & Company represented that the State of Florida guaranteed the payment of the bonds.

It must be kept in mind that plaintiff, in its petition, makes no claim that it was deceived through any of the statements appearing in the caption. We have heretofore stated and now repeat, that not only the caption but every other part of the circular may be considered if it lends any aid to any ambiguity in the quoted portion of the prospectus set out in the petition as the claimed misrepresentation. Reading the prospectus in its entirety we are unable to conclude that there was a representation that the state as an entity was guaranteeing the payment of the drainage taxes as a general obligation of the state. We think it clearly appears that the taxes to be levied, are payable by an individual owner or by the state from the resources of the district alone. The district was a separate entity, originally owned by the state, the title by act of Legislature being placed in the Internal Improvement board in trust for the state. While state owned, it was segregated from other parts of the state. The district alone was charged with its obligations. The named officers of the state were members of the board, and in this board was vested the management of the district. We think all this appears when we read this prospectus in its entirety.

The representative of the bank said he read the prospectus and from this we think it is inferable that he read it in its entirety. He had an obligation to read it understandingly and not negligently. **Volume 19, Ohio Jurisprudence (Fraud and Deceit),**

§§100. 101. Also see 12 Ruling Case Law, page 601.

Defendants' Exhibit 1 is a page from the bond register of the plaintiff bank, wherein is listed the $10,000.00 of bonds of the State of Florida Everglades Drainage District purchased from Spitzer, Rorick & Company, Toledo, Ohio. There is quoted on this page the following:

"Legal opinion Tracy, Chapman & Wells."

Mr. Reed, the agent of Spitzer, Rorick & Company, who conducted the negotiations with the plaintiff bank, states in his testimony that he handed to the bank's representative a copy of this letter from Tracy, Chapman & Wells. The notation on the page of defendants' Exhibit 1 supports his evidence.

The defendant Spitzer, Rorick & Company purchased from the State of Florida this entire issue of bonds at a price of practically 98. The evidence in the record discloses they made a very exhaustive and extended investigation not only as to the legality of the issue of the bonds, but the physical property itself before taking them over.

It is our conclusion that there is lack of evidence supporting plaintiff's claim of fraud.

Plaintiff, in its petition, as a further basis for recovery also alleges that the bonds in question were securities of a taxing subdivision, payable out of the proceeds of special taxes and not out of the proceeds of general taxes; that before marketing said bonds the dealer should have filed certain information together with the prospectus with the Securities Commission, which it failed to do and that by reason thereof the sale of said securities to the plaintiff was contrary to the provisions of §§6373-1 to 6373-4 GC.

The Supreme Court of the State of Florida held in a reported case that the taxes of the drainage district were general taxes and not special taxes.

The trial court held against the plaintiff on this question for two reasons:

1. That the securities were not required to be certified.

2. That no damages appeared, even if required to be certified.

We are in accord with the trial court on this question.

FOURTH ASSIGNMENT:

"The lower court erred in its application of the law with respect to the meas-

ure of damages and the judgment entered is excessive in amount."

It appears from the evidence that the bonds of the Everglades Drainage District at the time of the sale and for a number of years thereafter, were selling in the general market at approximately par. It was the claim of plaintiff, and so determined by the trial court, that the measure of damages was the difference between the purchase price (par) and the market value on January 1, 1932 (the maturity date). The market value at maturity date was found to be $1460.00 for the entire holding. It is conceded that this is contrary to the general rule of damages universally adopted through a long line of decisions by the courts of Ohio. The trial court declined to follow the generally accepted rule in Ohio, on the theory that plaintiff purchased the bonds as an investment and since the bonds were worth par in the market for a number of years after their purchase, the plaintiff would be without remedy unless a different rule was adopted. In examining the numerous Ohio cases, we are unable to find in their respective statements of facts anything leading to the conclusion that the property acquired in the claimed fraudulent transaction was not a permanent investment. In the interest of not extending this opinion to greater length, we shall not quote from the several Ohio cases but will merely cite them with suggestion that they be read in their entirety. First, we refer to **19 Ohio Jurisprudence, page 543, §272,** where the general rule is announced as follows:

"In Ohio, however, the rule is well settled that the measure of damages for fraud inducing the purchase or exchange of property is the difference between the property as it was represented to be and its actual value at the time of the purchase or exchange."

> **Molnar v Beriswell, 122 Oh St 348.**
> **Linerode v Rasmussen, 60 Oh St 545.**
> **Gray v Gordon, 96 Oh St 490.**
> **Elder v Schaffstal, 90 Oh St 265.**
> **Schenck v Knott, 13 C.C. (N.S.) 41.**

The trial court, in support of his reasoning in not following the Ohio rule on the measure of damages, relies upon the case of Duffy v Smith, 57 N. J. Law, 679 (32 Atlantic page 371).

Counsel for plaintiff cite the following cases, which they contend support the rule of damages as adopted by the trial court:

Hotaling v Leech & Co., 247 N. Y. 84 (159 NE 807).

Whiting v Price, 172 Mass. 240, (70 American State Reports, 262).

Addis v Swafford, 180 SW 548.

Hubbell v Meigs, 50 N. Y. 480.

None of these cases cited by counsel are strong in their holdings as the New Jersey case upon which the trial court relied.

We see little of value in the cited case, 172 Mass., supra.

Addis v Swafford, 180 SW supra, merely refers to the right after discovery of a fraud.

The writer of the text on the subject of fraud and deceit in **19 Ohio Jurisprudence, §272,** recognizes that there is variance in the rule of various jurisdictions as to the measure of damages.

"There is a conflict of authority as to the measure of damages recoverable for fraud inducing the purchase or exchange of property."

We do not think that the facts attending the instant case afford any substantial reason for any divergence from the universally adopted well-recognized and long-standing rule of Ohio. We are unable to agree with the conclusion that plaintiff would be without remedy in a proper case (where fraud is found, which we do not find), unless the general rule is receded from. We do not think that it is unusual in contracts induced by fraud for plaintiffs to find that they are unable to prove damages. These cases arise in instances where speculative profits would be the only element that might be shown. In such cases there is the remedy to rescind on notice, after discovering the fraud and demanding restitution. This remedy is very clearly pointed out in the case of Kuehl v Parmenter, 195 Iowa, 497.

"The plaintiff had a choice of legal remedies. He had the right to rescind upon notice after discovering the fraud and to demand restitution thereby establishing the status quo ante, or he could elect to let the transaction stand and sue for damages. * * * Apparently he attempted the latter but failed in his proof of damages. Plaintiff might seek relief in equity by prayer for rescission and cancellation and to recover his actual cash investment. Rescission in this event is not a condition precedent to his right to sue."

Based upon the rule of damages as we determine it to be, the plaintiff through its evidence presented no proof of damages.

FIFTH ASSIGNMENT:

"The court below erred in the admission of evidence to which defendants objected."

We sustain this assignment of error on the ground that the evidence presented had no tendency to support damages under the proper rule.

SIXTH ASSIGNMENT:

"The lower court erred in overruling defendants' motion for new trial and not entering judgment in favor of defendants."

For reasons set out in our comments under assignments 3 and 4, we likewise sustain assignment No. 6.

This court coming now to enter the judgment that should have been entered in the court below, enters final judgment in favor of defendants, at plaintiff's costs.

GEIGER, J, concurs in judgment, but is of opinion that §11222, GC, fixes the limitation for bringing the action.
HORNBECK, J, dissents.

### DISSENTING OPINION

By HORNBECK, J.

I am in accord with the opinion of Judge Barnes that §11226 GC is the statute of limitations controlling plaintiff's action. The court had jurisdiction over the defendants only because of that portion of §6373-3, GC, which required the dealer to irrevocably consent that any action brought against it arising out of and founded upon fraudulent disposal of securities might be brought in Franklin County. Whether or not the Blue Sky Act, as in effect when the cause of action arose would support an action against the defendant dealer based upon misrepresentation not amounting to actual fraud if the dealer was properly in the jurisdiction of the court is not presented on this record. The dealer is only within the jurisdiction of Franklin County courts by virtue of the consent which it was required to file under the provisions of §6373-3, GC, to which we have adverted.

I dissent from the majority opinion holding that as a matter of law the actionable language does not constitute overt fraud. This is an appeal on questions of law and the finding of the trial judge must be considered in all particulars, as would the verdict of the jury. In the determination of any factual issue every legal intendment must be indulged to support the finding and judgment. It is our opinion that the trial judge was within his province in determining that actual fraud had been established by the plaintiff. We will not discuss this factual issue at length. The trial judge properly considered all of the printed matter on the circular issued by defendant dealer, setting forth information respecting the issue of the bonds of the Everglades Drainage District as it might reflect upon the meaning, import, intent and effect of that part of the circular which plaintiff averred set forth the fraudulent misrepresentations of fact upon which it relied in the purchase of the securities. Part of the circular which was the subject matter assigned in the petition of the plaintiff as constituting the fraudulent misrepresentations was "so that in practical effect the State of Florida guarantees the payment of all drainage taxes, and the bonds payable therefrom."

The trial judge called attention to the fact that the circular emphasizes the proposition that the State of Florida guaranteed the payment of the bonds sold to the plaintiff in the particular that they were the obligations of the state. This conclusion is supported by the language employed and by the arrangement of subject matter and emphasis by heavy type of certain of the printed portions of the circular.

It should be noted that all the opinions except that of Mr. William H. Harris are identical in language pertinent to the representation which is the basis of plaintiff's suit. It is that:

"These bonds are also a quasi or indirect obligation of the State of Florida, in that the state owns approximately one-fourth of the lands within said Everglades Drainage District, against which drainage taxes are now, and have been since 1905, collected as required by law, and in the event that any other owner of lands within said drainage district neglects or refuses to pay his drainage taxes, the law requires that they be certified to the trustees of the Internal Improvement fund, a board of state officers, who hold all lands of the state in trust for the state, and at the end of two years, if not redeemed, the state's title becomes perfect."

This language is not as broad as the unqualified statement in the circular, to the effect that the State of Florida guarantees the payment of all drainage taxes and the bonds payable therefrom.

The circular carries the correct statement of the written opinion of the Attorney General of Florida, which is in accord with all the other written opinions made prior to the sale of the securities in question, but this is at another and different place in the circular than the actionable language which is a statement of fact, apparently made upon the knowledge of the dealer. In other words, the gist of most of the subject matter in the circular might support the claim that it was an innocent reiteration thereof by the dealer but this does not support the actionable language heretofore quoted.

In the letter of William H. Harris to defendant dealer it is said:

"The state, as authorized by law, pays taxes on lands owned by it at the same rates as are paid by other owners of lands in this district; when taxes levied on lands of other owners in said district become delinquent and remain unpaid, such lands revert to the State of Florida, and such delinquent taxes are at once paid by the state, so that payment of the principal and interest of said bonds is by this method guaranteed by the State of Florida."

This letter would afford support to the defendant dealer for the actionable language in the circular but it was not written until July 15, 1925, some twenty days after the sale of the bonds to the plaintiff. The statement of ·fact that "When taxes levied on lands of other owners in said district become delinquent and remain unpaid, such lands reverted to the State of Florida and such delinquent taxes are at once paid by the state", was, if not a clear misstatement of fact, at least misleading in import. It is true that it had been the practice up to the time that the Harris opinion was released, for the State of Florida to pay delinquent taxes when the lands reverted to it but the lands did not revert to the state for two years after the delinquent tax sale. Then, too, while the state had theretofore paid delinquent taxes on lands which reverted to it, it in no wise guaranteed the payment thereof beyond the proceeds which could be realized from the lands in the Everglades Drainage District.

Mr. Denman testifies, truthfully, no doubt, that a month or two before the date of the written opinion, he had orally stated the substance thereof to Mr. Rorick of the defendant dealer firm.

These opinions of the lawyers respecting the obligations of the State of Florida on the bonds of the Everglades Drainage District were admissible for two purposes: First, as they may have reflected upon the question whether or not the plaintiff relied upon the actionable statement of fact in the circular, inasmuch as it is claimed that he had the benefit of all the opinions before purchase of the bonds, and second, and the more important purpose at this juncture, whether or not the trial court could have found that the defendant, in the light of its information under the opinions, made the misrepresentations fraudulently. It is the claim of the defendant dealer that it is obvious that the actionable statement was made innocently and in good faith and grounded upon the written opinions of eminent lawyers.

The trial judge did not specifically discuss this question of the effect of the written opinions· touching the fraud of the defendant dealer. However, it must be assumed that he gave attention to this important question and resolved it against the defendant dealer. Obviously, the trial judge, no more than this court, could not discuss in a written opinion all of the questions argued at great length by counsel for the parties.

Mr Rorick of the defendant dealer firm was an attorney at law, skilled in the field of municipal bonds. It is established by extended testimony that he had been closely in touch with the development of the Everglades Drainage District continuously for many years prior to the sale of the bonds in question. He had made several trips to Florida and was familiar with the physical set-up of the drainage district, every development thereof, and with the legislation under which the district was controlled and managed. It is not too much to say that in probability he was as well informed on every phase of the law incident to the bonds as any attorney or firm from whom the defendant dealer secured opinions.

The experience of the management and control of the drainage district prior to the sale of the bonds was such that defendant dealer had every reason to believe that every obligation enjoined upon the district by reason of its bonds would be promptly and faithfully observed. This, however, did not justify the general statement that the State of Florida guaranteed the payment of these bonds, nor was there anything in the legislation or in the practice of the state respecting delinquent taxes on lands in the district which justified the conclusion that the State of Florida pledged its general credit to, the payment of

any obligation which would assure the payment of the bonds.

The trial court may have found that the Harris opinion did not fully explain the use of the actionable language; that it did not appear that the defendant dealer, under all the facts, acted innocently in making the representation of facts upon which plaintiff's cause was predicated. The question arises why was the one opinion which was not in existence when the circular was prepared be emphasized by heavy type in a prominent place in the circular.

There is a difference in the statements on the face of the circular, wherein in one instance the defendant dealer expressly stated. as a matter of fact: "So that in practical effect therefore the State of Florida guarantees the payment of all drainage taxes, and the bonds payable therefrom" and in the other instance merely sets forth the language of the opinion of the Attorney General of Florida.

The qualification of the actionable statement, "so that in practical effect, therefore," takes nothing away or adds nothing to the force of the language employed. The force of the statement · is in that part wherein it is said that the State of Florida guarantees the payment of all drainage taxes, etc. Whether or not it did it in practical effect or in any other manner takes from the language none of its convincing power.

The statement we hold to be actionable would, to the layman, indicate without qualification that the State of Florida was, if there was a delinquency in the payment of taxes on any tract of land and no bidder for any parcel thereof in a sum equal to the payment on the taxes due, generally liable for such taxes. The fact was and is that the state was only liable to the extent to which it could, through its trustees, realize money from the lands against which the taxes were levied.

The trial judge in the written opinion sets forth many other cogent reasons tending to support his conclusion that the representations were not innocent but were actionable as upon common law fraud.

I am further of the opinion that the trial judge adopted the correct rule as to the measure of damages. The general rule in Ohio is properly set forth in the brief of counsel for defendants, as announced in **19 O. Jur., §272:**

"The measure of damages for fraud inducing the purchase or exchange of property is the difference between the property as it was represented to be and its actual value at the time of the purchase or exchange."

To like effect are **Linerode v Rasmussen, 63 Oh St 545; Elder v Shoffstall, 90 Oh St 265; Gray v Gordon, 96 Oh St 490; Molnar v Beriswell, 122 Oh St 348.**

The trial judge recognized the general rule in Ohio,. as announced by **Schenck v Knott, 13 O.C.C. (N.S.) 41.** He refused to follow this rule but chose to adopt the measure of damages as announced in Duffy v Smith, 57 N. J. L. 679 and particularly in Hotaling v Leech & Co., 247 N. Y. 84, 159 NE 307, with slight modification. This was an action for damages for loss claimed to have been occasioned by fraud in the sale of a bond. It was held that "the plaintiff should be entitled to recovery from the defendant the loss which is the proximate result of the fraud that induced the investment; * * *."

"The true measure of damage is indemnity for the actual pecuniary loss suffered as a direct result of the wrong."

It was further held:
"If we hold that the plaintiff's damages are the difference between the market value of his bond at the time of its purchase and the price paid, we deny him all remedy in an action at law for the deceit."

So in this case, if the rule of damages as announced in the Ohio cases, supra, is followed, the plaintiff would recover none of the losses which it has actually suffered by reason of the misrepresentations of defendant dealer. In this case it appears that the bonds were purchased for investment and not for speculation. They were held until almost the date of their maturity. It fairly appears that plaintiff acted with reasonable promptness as soon as it learned that there was a default in the payment of the obligations on the bonds. The rule of damages adopted by the trial court merely accorded to the plaintiff that measure of damages which represented the actual loss which the record disclosed it suffered.

Under the facts here developed the general rule of the measure of damages takes away from the plaintiff any remedy for the wrong suffered. Such a situation is not contemplated in the law.